IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN INTER-FIDELITY EXCHANGE, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | 17 C 7934 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JOSEPH HOPE and CINDY JOHNSON, as Trustee of the Bankruptcy Estate of Joseph and Cassidi Hope, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| IURII RYPNINSKYI, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CASSIDAY SCHADE, LLP, JOSEPH PANATERA, ALEX CAMPOS, JAMES KOPRIVA, and KEITH AUBIN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this diversity suit against Iurii Rypninskyi and Joseph Hope—and Hope's bankruptcy trustee, who can be ignored—American Inter-Fidelity Exchange ("AIFE") seeks a declaratory judgment that it owes no duty to indemnify Rypninskyi for a monetary judgment entered in a case that Hope brought against him in state court, or to further defend Rypninskyi in connection with that case. Doc. 81. Rypninskyi in turn brought a third-party complaint against his state court counsel—Cassiday Schade, LLP and several of its attorneys (collectively, "Cassiday Schade")—alleging that their legal malpractice caused him to lose the state court case and therefore that *they* should pay the state court judgment if AIFE does not. Doc. 51.

1

In an earlier decision, familiarity with which is assumed, the court denied Hope's motion to dismiss AIFE's coverage claim. Docs. 49-50 (reported at 2018 WL 3208481 (N.D. Ill. June 29, 2019)). The court also denied Cassiday Schade's motion for summary judgment on the third-party claim. Docs. 150-151 (reported at 2019 WL 4189657 (N.D. Ill. Sept. 4, 2019)). Rypninskyi, Hope, and AIFE now cross-move for summary judgment on AIFE's claim. Docs. 243, 250, 253. The motions are denied.

## Background

Because the parties cross-move for summary judgment, the court must consider the facts in the light most favorable to Rypninskyi and Hope when considering AIFE's motion and in the light most favorable to AIFE when considering Rypninskyi's and Hope's motions. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). To the extent a disputed fact relates to two or more of the parties' motions, the court will set forth the parties' respective positions. At this juncture, the court does not vouch for any party's version of the facts. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

On May 31, 2014, Rypninskyi and Hope got into a vehicular accident while Rypninskyi was driving a truck owned by Leasing Truck Solution, Inc. Doc. 263 at ¶ 9; Doc. 264 at ¶¶ 3-4; Doc. 268 at ¶ 9 n.1. Hope filed a negligence suit against Rypninskyi and Leasing Truck in the Circuit Court of Cook County, Illinois. Doc. 268 at ¶ 9 n.1 (citing Doc. 81 at pp. 29-34). In February 2015, AIFE retained Cassiday Schade to defend Rypninskyi, its insured, under a "Truckers Policy" for auto liability. Doc. 264 at ¶ 41; Doc. 268 at ¶ 9; Doc. 271 at ¶ 9; Doc.

249-18 at pp. 10-54.  Rypninskyi participated in discovery but did not appear at his September 2017 trial, Doc. 249-7, and the jury returned a $400,000 verdict against him, Doc. 21-14.  AIFE claims that Rypninskyi violated the policy's cooperation clause by not appearing at trial, thus relieving it of its defense and indemnification obligations to him.  Doc. 81 at p. 2, ¶ 9.

### A.     The AIFE Truckers Liability Policy

Three aspects of the AIFE policy are pertinent here.

First, the policy defines "Persons Insured" as "[t]he Named Insured as appears on the Policy Declarations Page"—*i.e.*, an entity called "Expeditor Systems, Inc."—as well as "[e]mployee drivers of the Named Insured, and [certain additional] drivers under … lease[.]" Doc. 249-18 at pp. 10, 44-45.  Although Expeditor Systems is the policy's only "Named Insured," in the underlying suit Cassiday Schade—in its capacity as counsel for Rypninskyi— identified Expeditor Systems *and* Rypninskyi as the policy's "[n]amed insureds" in response to an interrogatory asking Rypninskyi to identify "all liability insurance" for Rypninskyi, Leasing Truck Solutions, and "any other person or entity" with an interest in the truck Rypninskyi was driving.  Doc. 264 at ¶¶ 16-17.

Second, the policy includes duty-to-defend and duty-to-indemnify provisions.  The duty-to-indemnify provision states that AIFE "will pay, for and on behalf of … the Named Insured, all sums legally owed by an 'Insured' because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto,'" and that AIFE  "will also pay all sums an 'insured' legally must pay as a 'covered pollution cost or expense' to which this insurance applies, caused by an 'accident' and resulting from ownership, maintenance, or use of a covered 'auto,' … if there is either 'bodily injury' or 'property damage' to which this insurance applies that is caused by the same 'accident.'"  Doc. 249-18 at p. 45.  The duty-to-defend provision states that AIFE has "the right

and duty to defend an 'insured' against a 'suit' asking for such damages or a 'covered pollution cost or expense.'" *Ibid*.

Third, the policy includes a cooperation clause, which provides that "any involved 'insured' must … [c]ooperat[e] with [AIFE] in the investigation or settlement of the claim or defense against the 'suit.'" *Id*. at p. 49. The question whether Rypninskyi violated that clause, and thus whether AIFE has a duty to indemnify and further defend him in the underlying suit, is at the center of AIFE's coverage claim.

### B. The MCS-90 Endorsement

The Motor Carrier Act, 49 U.S.C. § 10101 *et seq.*, and its implementing regulations require certain interstate "motor carriers" to provide the Federal Motor Carrier Safety Administration ("FMCSA") with proof of financial responsibility. *See* 49 U.S.C. § 31139(b)-(c); 49 C.F.R. § 387.7(d). One way a motor carrier can satisfy that requirement is to file an endorsement, called an "MCS-90," that modifies its truckers' liability policy. 49 C.F.R. § 387.7(d)(1). AIFE asserts in its Local Rule 56.1(b)(3)(C) statement that it filed an MCS-90 endorsement on behalf of Expeditor Systems in connection with the policy at issue here. Doc. 265 at ¶ 20 (citing Doc. 265-1 at pp. 5-6); Doc. 265-1 at p. 3 ¶ 6. That endorsement—which by its terms was "issued to" Expeditor Systems—states in relevant part that AIFE "agrees to pay … any final judgment recovered against *the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles," notwithstanding any "limitation contained in the policy." Doc. 265-1 at p. 5 (emphasis added). AIFE and Hope disagree over whether Rypninskyi is "the insured" for purposes of the endorsement—AIFE says no, while Hope says yes—and thus whether the endorsement precludes AIFE from asserting Rypninskyi's non-cooperation as a ground for declining to indemnify and further defend him in the underlying suit.

4

Hope's objections to the admission of evidence pertaining to the MCS-90 endorsement, Doc. 275 at ¶ 20, are overruled. While Hope contends that "AIFE's judicial admission that Rypninskyi was a Named Insured of [the AIFE policy] precludes introduction of facts to contradict or controvert that admission," *ibid.*, the scope of the MCS-90 endorsement presents an issue distinct from "named insured" status under the policy. Hope also asserts that the endorsement is inadmissible because there is no evidence that it was filed with the FMCSA and AIFE did not produce it during discovery. *Ibid.* However, AIFE's assertion that it filed the endorsement is supported by its president's affidavit, Doc. 265-1 at p. 3, ¶ 6, and its failure to timely produce the endorsement in discovery is harmless because it is difficult to imagine any line of inquiry that Hope could not pursue due to the belated production. *See* Fed. R. Civ. P. 37(c)(1) (allowing a party to use a document, despite the party's failure to properly disclose it in discovery, if the failure was "harmless").

### C.     Rypninskyi's Participation in His Defense Before Trial

Rypninskyi is a Ukrainian citizen and a lawful permanent resident of the United States. Doc. 263 at ¶ 2; Doc. 264 at ¶ 2. He understands English "[i]n a limited ability up to [his] professional demand" and can read some English. Doc. 252-1 at 1-2 (4:16-21, 5:1-10); Doc. 263 at ¶ 2; Doc. 264 at ¶ 2.

As noted, AIFE retained Cassiday Schade in February 2015 to represent Rypninskyi in the underlying suit. Doc. 264 at ¶ 41. On several occasions early in the representation, Rypninskyi provided Cassiday Schade with information pertinent to his defense, both over the phone and in meetings. Doc. 263 at ¶ 18; Doc. 264 at ¶¶ 42-49, 55-59. Those interactions included several discussions in June 2016 concerning his written discovery responses, which he signed during a meeting on June 30. Doc. 264 at ¶¶ 45-49. Shortly after that meeting, Rypninskyi left the country for several months. *Id.* at ¶ 50. He came back to the United States in

September 2016, and then made two additional trips abroad before returning on March 6, 2017. *Id*. at ¶¶ 50-52.

Joseph Panatera, one of the Cassiday Schade lawyers, testified at his deposition that while Rypninskyi was in and out of the country, he and his Cassiday Schade colleagues sent Rypninskyi letters at several addresses and called him multiple times to attempt to schedule his deposition. Doc. 275 at ¶ 1 (citing Doc. 249-1 at 7 (21:12-18)). (Hope disputes this assertion on hearsay grounds, Doc. 275 at ¶ 1, but Panatera and his colleagues' sending letters and making phone calls are not hearsay because they are not "statements" under Evidence Rules 801(a) and (c).) Cassiday Schade enlisted the help of a private investigator to track Rypninskyi down. *Id*. at ¶ 2 (citing Doc. 249-1 at 7 (21:19-22)). On March 1, 2017, Panatera spoke to Rypninskyi's wife, who said that he was visiting Ukraine through the following week and living in Illinois, but that it was "complicated." Doc. 249-1 at 60 (234:23-235:5); Doc. 264 at ¶¶ 53-54.

On April 3, 2017, another Cassiday Schade lawyer, Victoria Shoemaker, who speaks Russian, Doc. 21-12 at 1, spoke with Rypninskyi by phone about appearing for his deposition, Doc. 264 at ¶ 55; Doc. 21-7 at 1. On April 11 and 13, Shoemaker and Rypninskyi exchanged a series of text messages. Doc. 268 at ¶¶ 13 & n.2, 14; Doc. 271 at ¶¶ 13 & n.2, 14. (There is no need to resolve whether the texts were "iMessages"—a type of text sent between two iPhone users—or ordinary text messages, *see ibid*., because resolving that question would not affect the outcome of the present motions.) On April 11, Shoemaker texted Rypninskyi the following message, which included a Russian translation:

> Iurii, please come to Cassiday Schade's office at 20 N. Wacker Drive, Suite 1000 in Chicago this Friday [April 14] at 12pm. If you can make it a little earlier, it would be great. You will meet with your lawyer Joe Panatera with interpreter and then give the deposition. I copied Joe on this text.

Doc. 249-4 at 1 (text message screenshot). Rypninskyi replied, "Ok," that day. *Id*. at 2. On April 13, Shoemaker texted Rypninskyi a second time—again with an accompanying translation—stating: "I called and left you a message. We moved the meeting and your deposition to Monday, April 17, at 12 pm." *Ibid*. That day, Rypninskyi again replied, "Ok." *Ibid*. According to AIFE, Cassiday Schade sent Rypninskyi a third text message on April 17 asking him to confirm his plan to attend the deposition later that day, to which Rypninskyi never responded. Doc. 247 at ¶ 15; Doc. 249-4 at 2-3. Rypninskyi asserts that "he has no recollection of ever receiving th[at] message[] and a diligent search of his mobile phone did not reveal the[] message[]." Doc. 249-5 at ¶ 1; Doc. 268 at ¶ 15; Doc. 271 at ¶ 15.

As planned, on April 17, Rypninskyi sat for a discovery deposition and an evidence deposition. Docs. 249-16, 249-17. As of that date, trial was set for July 11, 2017. Doc. 264 at ¶ 60. Two points about Rypninskyi's depositions bear mention here.

First, Rypninskyi testified that he lived at an address in Parma, Ohio, and had no plans to move. Doc. 268 at ¶ 17; Doc. 271 at ¶ 17. Specially, he testified:

> Q: Do you have any plans on moving from that address in Parma?
>
> A: Right now, no.
>
> Q: Do you have any plans as you're sitting here today to return back to Ukraine?
>
> A: No.
>
> Q: Your plan as we're sitting here talking today is to continue living in the United States?
>
> A: Yes.

Doc. 249-17 at 5 (9:16-24).

Second, the parties disagree over whether, on the day of the depositions, Panatera told Rypninskyi that he needed to attend trial if the case did not settle. Doc. 275 at ¶ 5. To support

its position, AIFE cites Panatera's deposition testimony that he twice "advise[d] … Rypninskyi that if this matter went to trial that he needed to attend and participate in trial." Doc. 255-7 at 40-41 (39:21-23, 40:1-16). According to Panatera, he initially communicated that message to Rypninskyi before the depositions using a translator and repeated it afterward without a translator. *Ibid*. Panatera "came away with thinking" that Rypninskyi understood him in English, particularly because the pair had "spoken during breaks and other times in English" and "the investigator … [had] advised [Panatera] that he was able to speak to … Rypninskyi in English." *Id*. at 41-42 (40:24-41:16). Hope denies that Panatera told Rypninskyi that he was obligated to attend trial, Doc. 275 at ¶ 5, and cites Rypninskyi's deposition testimony that, when he was deposed in the underlying suit, he did not "understand that there was going to be a trial sometime in the future," Doc. 252-1 at 8 (30:24-31:17).

### D. Efforts to Secure Rypninskyi's Attendance at Trial

Shortly after Rypninskyi's depositions, Cassiday Schade moved to continue the trial from July 11 to September 28, 2017. Doc. 264 at ¶ 62. The state court granted the motion on June 9, 2017. *Ibid*. On July 29, Rypninskyi left for Ukraine and did not return until November 2, well after the trial had concluded. *Id*. at ¶ 68. The parties dispute what efforts were taken to inform Rypninskyi of the September 28 trial date, and whether he knew of that date before leaving for Ukraine. The pertinent facts are as follows.

#### 1. July 7 Text Message

AIFE asserts that Panatera sent Rypninskyi an iMessage on July 7 informing him that the trial date had been continued to September 28. Doc. 249 at ¶ 22 (citing Doc. 249-4 at 3 and Doc. 255-7 at 58-59 (57:16-58:7)). The message—to which Rypninskyi never responded—purportedly stated: "Iurri, your case is set for TRIAL in Chicago on September 28. You will have at [sic] be there on September 29, October 2, and October 3. Please confirm that you will

be able to attend. Thank you[.]" Doc. 249-4 at 3. AIFE further asserts that the message was sent through "the same chain" of messages that Panatera and Shoemaker had used to contact Rypninskyi to schedule his deposition, Doc. 249 at ¶ 23; Doc. 275 at ¶ 9; *see* Doc. 255-7 at 58-59 (57:16-58:3); Doc. 249-4 at 3, and that Panatera had "no indication that [the message] did not go through," Doc. 255-7 at 220 (219:1-19); Doc. 249 at ¶ 24; Doc. 275 at ¶ 13. In support, AIFE notes that the iMessage "appeared in blue on … Panatera's phone" and that "iMessage only works (and only appear[s] to the sender in blue) when both users have a working Internet connection." Doc. 249 at ¶¶ 13 n.2, 24 n.3 (citing *About iMessage and SMS/MMS*, apple.com, https://support.apple.com/en-us/HT207006 (last visited July 21, 2021)).

Rypninskyi and Hope assert that Rypninskyi did not receive an iMessage from Panatera on July 7, citing Rypninskyi's averment that "he ha[d] no recollection of ever receiving th[e] message[] and a diligent search of his mobile phone did not reveal the[] message[]." Doc. 249-5 at ¶ 1; *see* Doc. 268 at ¶ 24; Doc. 271 at ¶¶ 22-24. Moreover, Hope objects on hearsay grounds to AIFE's assertion, supported by Panatera's testimony and the text message screenshot, that the July 7 iMessage was sent through "the same chain" of messages that Panatera and Shoemaker used to contact Rypninskyi previously. Doc. 268 at ¶ 23. Because Panatera's conduct (sending a message through a particular means) is not a statement, the objection is overruled. Joined by Rypninskyi, Hope further contends that AIFE's assertion concerning the message's "blue" color is inadmissible because the Apple webpage cited by AIFE does not substantiate the assertion. Doc. 268 at ¶¶ 13 n.2, 23; Doc. 271 at ¶¶ 13 n.2, 24 n.3. That objection is sustained; the webpage does not support AIFE's assertion that "iMessage *only* works (and *only* appear[s] to the sender in blue)" when both phones are connected to the Internet, Doc. 249 at ¶ 13 n.2 (emphases added), and AIFE in any event does not show that the information on the webpage accurately

conveys how iMessage worked on July 7, 2017, more than two years before the page was published (September 19, 2019).

### 2. Phone Calls

AIFE asserts that, in the months preceding the September 28 trial, attorneys from Cassiday Schade called Rypninskyi's mobile phone multiple times in an effort to reach him. Doc. 247 at ¶¶ 21, 34; Doc. 275 at ¶ 14. That assertion rests on Panatera's testimony that, starting in late July, he directed other attorneys at Cassiday Schade to call Rypninskyi's phone, and that he himself tried to call Rypninskyi "more than ten times" but Rypninskyi never picked up and he "could not leave a voice message" because "the voice mail was not set up." Doc. 255-7 at 66-67 (65:19-66:14). It is undisputed that Rypninskyi was in Ukraine during that time, and when traveling to Ukraine, he would remove the SIM card from his phone and replace it with a local SIM card. Doc. 252-1 at 36 (142:22-143:15); *see* Doc. 268 at ¶ 27; Doc. 271 at ¶ 27.

Hope objects on hearsay grounds to AIFE's assertion that Cassiday Schade attempted to call Rypninskyi several times and, joined by Rypninskyi, disputes that assertion as a factual matter. Doc. 268 at ¶¶ 21, 34; Doc. 271 at ¶¶ 21, 34; Doc. 275 at ¶ 14. Because Panatera's actions (calling Rypninskyi and directing his colleagues to call him) are not statements under Evidence Rule 801, and because Panatera testified that he made the calls and asked his colleagues to call as well, the hearsay objection is overruled. As to whether Panatera and his colleagues in fact called Rypninskyi "more than ten times," the record offers support for both sides.

According to Rypninskyi and Hope, Panatera's and Rypninskyi's phone records contradict Panatera's testimony that Cassiday Schade lawyers called Rypninskyi more than ten times. Doc. 268 at ¶¶ 21, 34; Doc. 271 at ¶¶ 21, 34; Doc. 275 at ¶ 14. (Contrary to AIFE's

submission, Doc. 272 at 8-9, the phone records are accompanied by custodial affidavits that satisfy Evidence Rule 803(6), allowing their admission, Doc. 279 at 1; Doc. 280 at 1; *see Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).)  True enough, Panatera's phone records reflect no phone calls to Rypninskyi from June 2017 onward, and Rypninskyi's phone records reflect only one call from Cassiday Schade's main line on September 8, 2017.  Docs. 279-280; *see* Doc. 268 at ¶¶ 21, 34; Doc. 271 at ¶¶ 21, 34; Doc. 275 at ¶ 14; Doc. 269 at 13.  However, as AIFE observes, it is not clear whether the records capture various *attempted* calls—that is, calls made but not answered, sent directly to voicemail, sent to a full voicemail, or sent to a phone with its SIM card removed.  Doc. 272 at 9; Doc. 281.  Panatera's phone records do not speak to those questions.  Doc. 279 at 1-49.  Rypninskyi's phone records purport to capture incoming calls sent to voicemail, Doc. 280 at 6, which is evidenced by the fact that they document the September 8 call from Cassiday Schade's main line, *id*. at 771.  But it is conceivable, for example, that the September 8 call was documented, but earlier calls were not, because Rypninskyi did not have a SIM card in his phone in July and August but obtained a local SIM card in September.  Rypninskyi's deposition testimony further muddles the record, as he testified that he would not "have received a phone call made to [his] U.S. phone number while in Ukraine."  Doc. 252-1 at 36 (143:16-19).  Accordingly, the court cannot conclude on summary judgment that Cassiday Schade lawyers either did or did not call Rypninskyi's phone multiple times in the months preceding the September 28 trial.

### 3.    Letters

Cassiday Schade hired private investigators to inform Rypninskyi that it was imperative for him to attend the September 28 trial.  Doc. 268 at ¶ 29; Doc. 271 at ¶ 29.  The investigators attempted to deliver several letters to Rypninskyi.

On September 20, an investigator delivered to Rypninskyi's Ohio address a letter dated September 18 advising him of the upcoming trial. Doc. 264 at ¶ 71 (citing Doc. 255-7 at 233-234 (232:1-233:20)); Doc. 275 at ¶¶ 15-16. The investigator gave the letter to Rypninskyi's ex-wife, who had divorced him the previous day. Doc. 264 at ¶¶ 70, 71. The letter, which was signed by Panatera, stated:

> It is absolutely imperative that you at [sic] the trial. If you fail to do so, the plaintiff can have you "defaulted" and judgment entered against you. In addition, you are jeopardizing any coverage that the insurance company for Leasing Truck Solutions, Inc. may provide you, and should that occur, you may be held personally liable for payment of any judgment entered against you.

Doc. 21-8 at 1-2. On September 21 and 24, the investigator gave Rypninskyi's ex-wife Russian translations of the letter. Doc. 21-9; Doc. 268 at ¶ 30; Doc. 271 at ¶ 30; Doc. 275 at ¶¶ 15-16.

At some point, Cassiday Schade learned from the papers filed in Rypninskyi's divorce case that he might be living at an address in Chicago. Doc. 264 at ¶ 69; Doc. 268 at ¶ 29; Doc. 275 at ¶ 17; Doc. 255-7 at 70 (69:6-14). Cassiday Schade provided that information to another private investigator, who, on September 25 and 27, delivered two letters to the Chicago address, leaving them with a man identifying himself as Rypninskyi's "roommate." Doc. 21-11 at 2; Doc. 268 at ¶ 32; Doc. 271 at ¶ 32.

On September 30, two days after the start of jury selection, the second investigator left another letter, dated that same day, at the doorstep of Rypninskyi's Chicago residence. Doc. 268 at ¶ 31; Doc. 21-11 at 2. The letter stated:

> This letter is a follow-up to our previous letters. As we have told you, trial has begun in the case involving the accident on May 31, 2014. YOU MUST APPEAR AT COURT ON MONDAY, OCTOBER 2, 2018. **YOUR FAILURE TO DO SO MAY RESULT IN PLAINTIFF ENTERING A DEFAULT JUDGMENT AGAINST YOU, AND MAY HAVE THE EFFECT OF JEOPARDIZING ANY INSURANCE COVERAGE THAT YOU MAY HAVE AVAILABLE TO YOU. YOU WOULD THEN BE**

**PERSONALLY RESPONSIBLE TO PAY ANY JUDGMENT
ENTERED AGAINST YOU.**

Doc. 21-12 at 1. A copy of the letter was left again at the doorstep of the Chicago residence on

October 1. Doc. 268 at ¶ 31; Doc. 21-11 at 2. (AIFE asserts that the letter—which is addressed

to Rypninskyi's Ohio address, Doc. 21-12 at 1—was also sent to the Ohio address, Doc. 247 at

¶ 31. Hope contends that there is no evidence to support that assertion, and adds that even if the

letter was sent to Ohio, it could not have been received by Rypninskyi's ex-wife until October 4.

Doc. 268 at ¶ 31. That dispute need not be resolved because it does not impact resolution of the

present motions.)

     In October, AIFE hired Bates Carey LLP—its counsel in this case—to evaluate whether

it had a valid coverage defense against Rypninskyi under the policy's cooperation clause. Doc.

264 at ¶ 37. On October 4, Bates Carey sent a reservation of rights letter to Rypninskyi's Illinois

and Ohio addresses. Doc. 264 at ¶ 36; Doc. 252-6 at 11-13 ("Your failure to cooperate in the

defense of the Hope Lawsuit is a breach of the [cooperation clause]. As a result, it appears that

no coverage may be available under the Policy. … AIFE maintains a full reservation of all rights,

remedies and defenses under the Policy, including, but not limited to, the right to withdraw from

its defense of the Hope Lawsuit and disclaim coverage for any indemnity sought under the

Policy in connection with this matter."). Although Hope disputes that the letter was in fact sent,

Doc. 264 at ¶¶ 36, 38, AIFE's assertion that it was sent is supported by the cited evidentiary

materials, Doc. 264 at ¶ 36; Doc. 252-6 at 5-6 (19:5-22:3). Hope also disputes whether the letter,

if sent, was delivered to either the Ohio or Illinois addresses, Doc. 264 at ¶ 39, but it is

unnecessary to resolve that dispute because—as explained below—Hope fails to show that

Rypninskyi was prejudiced by (assertedly) not having received a reservation of rights from

AIFE.

E.       The Impact of Rypninskyi's Absence from Trial

Cassiday Schade had planned to offer Rypninskyi's testimony at trial.  Doc. 268 at ¶ 43;

Doc. 271 at ¶ 43.  Assuming that Rypninskyi would have given the same testimony he gave at

his evidence deposition, he would have testified that Hope collided with the back of his truck a

short while after he had changed lanes; that he used his turn signal before changing lanes; that

the damage to his truck was "barely noticeable" and "just scratches"; and that Hope told him

after the accident that "everything is all right."  Doc. 268 at ¶ 44; Doc. 271 at ¶ 44.  Rypninskyi

in fact gave a statement along those lines to a police officer following the crash.  Doc. 21-2 at 2.

According to the officer's report, Rypninskyi stated that "he was driving in the left lane," that he

"applied his brakes due to traffic slowing down ahead of him," and that Hope "rear ended him."

*Ibid*.  Also according to the report, Hope stated that "he was in the left lane and was looking at

traffic to his right so he could change lanes," and "that while he was looking back, he didn't

notice [Rypninskyi's truck] change lanes in front of him and stop."  *Ibid*.; *see* Doc. 268 at ¶ 53;

Doc. 271 at ¶ 53.

When trial commenced, Hope moved for sanctions based on Rypninskyi's failure to

appear.  Doc. 268 at ¶¶ 39-40; Doc. 271 at ¶¶ 39-40.  The court granted the motion, (1) striking

Rypninskyi's affirmative defense that Hope was contributorily negligent by rear-ending

Rypninskyi's truck; (2) giving the jury an adverse inference instruction stating that, had

Rypninskyi testified, his testimony would have been contrary to his interests; and (3) barring

Rypninskyi's liability expert from offering any opinions based on Rypninskyi's deposition

testimony or his statements in the police report.  Doc. 268 at ¶ 41; Doc. 271 at ¶ 41.  In addition,

the court barred the defense from introducing Rypninskyi's evidence deposition testimony

because the defense could not show that Rypninskyi was outside Cook County.  Doc. 268 at ¶ 41

(citing Doc. 249-8 at 4 (15:6-19)).  And the court granted Hope's motion *in limine* to bar the

defense from introducing into evidence the police report because the officer could not vouch for its accuracy. Doc. 249-8 at 15 (57:1-59:4); Doc. 268 at ¶ 52; Doc. 271 at ¶ 52.

While the trial was underway, Cassiday Schade asked the court whether its ruling concerning the police report barred the defense from referring to the report and the witness statements therein. Doc. 268 at ¶ 54; Doc. 271 at ¶ 54. The court declined to provide additional guidance. Doc. 268 at ¶ 55; Doc. 271 at ¶ 55. When cross-examining Hope's expert, Panatera asked about Hope's statements in the police report. Doc. 268 at ¶ 56; Doc. 271 at ¶ 56. Hope's counsel objected, citing the *in limine* ruling. Doc. 268 at ¶ 57; Doc. 271 at ¶ 57. The court agreed that the question violated its ruling, and as a sanction defaulted Rypninskyi as to liability. *Ibid*. After being instructed that it must find against Rypninskyi on liability, the jury assessed $400,000 in damages. Doc. 268 at ¶¶ 58-59; Doc. 271 at ¶¶ 58-59. The court entered a final judgment on October 6. Doc. 264 at ¶ 27. Cassiday Schade did not appeal the judgment. Doc. 268 at ¶¶ 61-63; Doc. 271 at ¶¶ 61-63.

On November 2, AIFE filed this suit. Doc. 264 at ¶ 28.

## Discussion

AIFE claims that Rypninskyi violated the policy's cooperation clause by failing to appear at trial, thus relieving it of its duty to indemnify and further defend him in connection with Hope's lawsuit. Doc. 81 at ¶¶ 59-66. Hope contends that certain threshold obstacles prevent AIFE from invoking the cooperation clause, and he and Rypninskyi argue on the merits that Rypninskyi did not violate the clause in any event.

## I.    Threshold Issues

### A.    MCS-90 Endorsement

As noted, AIFE filed an MCS-90 endorsement that modified the policy in question. The endorsement, whose language is dictated by 49 C.F.R. § 387.15, states in relevant part that AIFE

15

"agrees to pay… any final judgment recovered against *the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles," notwithstanding any "limitation contained in the policy." Doc. 265-1 at p. 5 (emphasis added).

The parties dispute whether Rypninskyi is an "insured" for purposes of the endorsement. Hope answers yes, and if he is right, AIFE must pay the state court judgment notwithstanding Rypninskyi's asserted violation of the policy's cooperation clause. Doc. 251 at 4-9; Doc. 274 at 2-11. AIFE responds that Expeditor Systems is the only "insured" for purposes of the endorsement, and that because judgment was entered against Rypninskyi, the endorsement's limitation on its ability to invoke the cooperation clause against Expeditor Systems does not apply here. Doc. 267 at 3-10.

To support his view, Hope focuses on the interrogatory response served in the underlying suit on Rypninskyi's behalf by Cassiday Schade identifying Rypninskyi, as well as Expeditor Systems, as the "named insureds" under the AIFE policy. Doc. 251 at 4-9. The court will assume without deciding that Rypninskyi is a "named insured" under the policy. Hope proceeds to argue that Rypninskyi's status as a "named insured" under the policy necessarily means that he is an "insured" for purposes of the MCS-90 endorsement. *Ibid*. AIFE responds that Rypninskyi's status as a "named insured" under the policy is immaterial because he is not also the "motor carrier" named in the policy and the endorsement. Doc. 267 at 3-10. As AIFE sees it, what triggers the endorsement is a final judgment against "the *motor carrier* on whose behalf the endorsement was filed," which is Expeditor Systems, not Rypninskyi. *Id*. at 8.

AIFE has the better of the argument. The Motor Carrier Act states that, before an entity may be "*register[ed] [as] a motor carrier*," it must provide proof of insurance "sufficient to pay[] … for each *final judgment against the registrant* for bodily injury to, or death of, an

16

individual resulting from the negligent operation, maintenance, or use of motor vehicles[.]" 49 U.S.C. § 13906(a)(1) (emphasis added). The emphasized language makes clear that the MCS-90 endorsement's purpose is to assure payment of a final judgment against the "registrant"—that is, the registered "motor carrier" to which the endorsement is issued. The FMCSA's implementing regulations provide that the insurer, in the MCS-90 endorsement, must "agree[] to pay, within the limits of liability described herein, any final judgment recovered against *the insured* for public liability resulting from negligence in the operation, maintenance or use of motor vehicles[.]" 49 C.F.R. § 387.15 ("The Forms … MCS-90 are available from the FMCSA website at http://www.fmcsa.dot.gov/mission/forms."). Because the regulation must be read in conjunction with the statute, the "insured" against which the "final judgment" is entered (as stated in the regulation) must be the "registrant" against which the "final judgment" is entered (as stated in the statute)—and because the statute makes clear that the "registrant" is the "motor carrier," the "insured" in the endorsement must be the registered motor carrier.

Other provisions in the implementing regulations confirm the point. The regulations state that the term "[i]nsured … means the *motor carrier* named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." 49 C.F.R. § 387.5 (emphasis added). And the regulations require that "[t]he endorsement … be issued in the exact name of the motor carrier." 49 CFR § 387.15. It follows from those provisions that Expeditor Systems, as the "motor carrier named in the … endorsement," is "the insured," and the only "insured," in the endorsement. Doc. 265-1 at p. 5 (listing "Expeditor Systems Inc." in the "[i]ssued to" line of the endorsement). Finally, Expeditor Systems indisputably qualifies as "the motor carrier named in the *policy of insurance*," 49 C.F.R. § 387.5 (emphasis added), because it is the "motor carrier" that was issued the endorsement and the

"named insured" under the AIFE policy. That Expeditor Systems is the named "motor carrier" in the policy *and* the endorsement is unsurprising, given that the thrust of the Motor Carrier Act's scheme is to assure payment of a final judgment against the entity "register[ed] [as] a motor carrier." 49 U.S.C. § 13906(a)(1).

Hope retorts that Rypninskyi, as one of the policy's "named insureds," is also a named "motor carrier" under the policy and thus an "insured" for purposes of the endorsement. Doc. 274 at 8-9. Central to Hope's view is the proposition that Rypninskyi is a "motor carrier" within the meaning of the FMCSA regulations. The regulations state:

> Motor carrier means a for-hire motor carrier or a private motor carrier. The term includes, but is not limited to, a motor carrier's agent, officer, or representative; an employee responsible for hiring, supervising, training, assigning, or dispatching a driver; or an employee concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories.

49 C.F.R. § 387.5. The regulations state in turn that "[f]or-hire motor carrier means a person engaged in the transportation of goods or passengers for compensation," and that "[p]rivate motor carrier means a person who provides transportation of property or passengers, by commercial motor vehicle, and is not a for-hire motor carrier." 49 C.F.R. § 390.5T.

Hope's argument is unpersuasive. Granted, as "a person" transporting goods or passengers for compensation, Rypninskyi might at first blush be thought a "private motor carrier" under 49 C.F.R. § 390.5T. And given the (assumed) fact that Rypninskyi is a "named insured" under the policy, it might also appear at first blush that Rypninskyi, like Expeditor Systems, is the "insured" for purposes of the endorsement, *i.e.*, "the motor carrier named in the policy of insurance." 49 C.F.R. § 387.5.

The flaw with this line of reasoning is that it rests on the faulty premise that Rypninskyi is a "motor carrier" named in the AIFE policy even though he is not the "motor carrier" named in

the MCS-90 endorsement modifying the policy. To be sure, the definition of "insured" in 49 C.F.R. § 387.5 is phrased in the disjunctive, encompassing "the motor carrier named in the policy of insurance, surety bond, endorsement, *or* notice of cancellation." 49 C.F.R. § 387.5 (emphasis added). To Hope's credit, the disjunctive "or" could suggest that a "motor carrier" named in the policy may not be the "motor carrier" named in the endorsement and still qualify as an "insured" under the endorsement.

This conclusion has surface appeal but is incompatible with the statutory and regulatory scheme. The Motor Carrier Act contemplates several means by which a motor carrier may satisfy its obligation to provide proof of financial responsibility. *See* 49 U.S.C. § 13906(a)(1) ("The Secretary [of Transportation] may register a motor carrier under section 13902 only if the registrant files with the Secretary a bond, insurance policy, *or* other type of security approved by the Secretary … .") (emphasis added). The regulations state that a motor carrier may provide such proof with an MCS-90 endorsement to its insurance policy, a surety bond, or written authorization from the FMCSA to self-insure. *See* 49 C.F.R. § 387.7(d). With that context in mind, the regulatory definition of "insured"—"the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier"—is best understood as identifying the entity or entities that qualify as "*the* motor carrier" because the definition refers to one or more of several documents providing proof of financial responsibility, each naming that same entity or entities. 49 C.F.R. § 387.5 (emphasis added). Accordingly, "the motor carrier" named in the endorsement—here, Expeditor Systems—is necessarily "the motor carrier" named in the insurance policy. *Ibid*.

This conclusion is confirmed by regulatory guidance issued by the FMCSA in 2005. The guidance states in relevant part:

> Question: Does the term "insured," as used on Form MCS-90, Endorsement for Motor Carrier Policies of Insurance for Public Liability, or "Principal", as used on Form MCS-82, Motor Carrier Liability Surety Bond, mean the motor carrier named in the endorsement or surety bond?

> Guidance: Yes. Under 49 CFR 387.5, "insured and principal" is defined as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." Form MCS-90 and Form MCS-82 are not intended, and do not purport, to require a motor carrier's insurer or surety to satisfy a judgment against *any party other than the carrier named in the endorsement* or surety bond or its fiduciary.

Federal Motor Carrier Safety Administration, *Regulatory Guidance for Forms Used to Establish Minimum Levels of Financial Responsibility for Motor Carriers*, 70 Fed. Reg. 58,065, 58,066 (Oct. 5, 2005) (emphasis added). As the guidance explains, the MCS-90 endorsement here required AIFE to provide coverage for a (hypothetical) lawsuit by Hope against Expeditor Systems—the motor carrier named in the policy and the endorsement—but not for a suit against "any party other" than the motor carrier, including Rypninskyi. The guidance is entitled to *Auer* deference, as it reflects the FMCSA's "authoritative" position on the issue, implicates the agency's "substantive expertise," and represents the agency's "fair and considered judgment" as opposed to a convenient litigating position. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416-18 (2019). Accordingly, even if the pertinent regulatory provisions were ambiguous as to whether Rypninskyi is an "insured" for purposes of the endorsement, the ambiguity would be resolved in AIFE's favor by answering that question in the negative. *See id*. at 2415-23 (holding that courts should defer to "reasonable agency constructions" of "genuinely ambiguous" regulations).

In sum, Expeditor Systems, not Rypninskyi, is "the insured" for purposes of the MCS-90 endorsement, as Expeditor Systems is the registered motor carrier named in the endorsement and policy. *See* 49 C.F.R. § 387.5. The endorsement therefore does not preclude AIFE from asserting its non-cooperation defense against Rypninskyi.

### B.     Estoppel and Waiver

Hope next argues that AIFE's suit is "untimely as a matter of law" because it was filed after judgment was entered in the underlying suit.  Doc. 251 at 9-10; Doc. 269 at 3.  Citing *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 708 N.E.2d 1122 (Ill. 1999), Hope contends that an insurer that files a declaratory judgment action after a final judgment in the underlying suit is estopped from asserting defenses to coverage.

As this court explained in denying Hope's motion to dismiss, 2018 WL 3208481 (N.D. Ill. Sept. 4, 2019), this argument reads *Ehlco* far too broadly.  *Ehlco* holds that "an insurer which takes the position that a complaint potentially alleging coverage is not covered under a policy that includes a duty to defend may not simply refuse to defend the insured."  708 N.E.2d at 1134. Rather, *Ehlco* explains, the insurer must either: "(1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage.  If the insurer fails to take either of these steps and is later found to have wrongfully denied coverage, the insurer is estopped from raising policy defenses to coverage."  *Id*. at 1134-35.

AIFE submits that it chose the first option and defended Rypninskyi under a reservation of rights.  Doc. 267 at 10-16; Doc. 272 at 3; *see Great W. Cas. Co. v. Cote*, 847 N.E.2d 858, 862 (Ill. App. 2006) ("The [*Ehlco*] [c]ourt specifically stated that its holding was based on an estoppel theory and was applicable only to an insurer that had breached its duty to defend.").  In so arguing, AIFE suggests that Cassiday Schade's communications to Rypninskyi before trial and shortly after trial began (several letters and the July 7 iMessage) might qualify as a valid reservation of AIFE's rights, Doc. 267 at 14 n.6, but that point is buried in a footnote and therefore forfeited for summary judgment purposes.  *See Cross v. United States*, 892 F.3d 288, 294 (7th Cir. 2018) (holding that a party forfeited an issue by raising it only "succinctly in a

21

footnote" in the district court) (internal quotation marks omitted).  Accordingly, the only communication that could possibly qualify as a reservation of rights is the letter that Bates Carey attempted to send to Rypninskyi on October 2, two days after the day he was supposed to appear at trial and several days after the start of jury selection.  Doc. 267 at 13.

Hope contends that the letter did not reserve AIFE's rights because it was never delivered and because, in any event, it was "sent too late as a matter of law."  Doc. 251 at 11; Doc. 269 at 3-4, 10; Doc. 274 at 13-14.  There is no need to resolve that dispute, for even if Hope were correct, his estoppel argument fails because he does not point to any way Rypninskyi was prejudiced by AIFE's failure to deliver its reservation of rights.  Under Illinois law, if "an insurer assumes an insured's defense without a reservation of rights, the insurer will not be equitably estopped from denying coverage *unless* prejudice exists," and "prejudice will be found if the insurer's assumption of the defense induces the insured to surrender her right to control her own defense."  *Standard Mut. Ins. Co. v. Lay*, 989 N.E.2d 591, 596 (Ill. 2013) (emphasis added). Estoppel is an affirmative defense under Illinois law, one on which Hope bears the burden of proving "by clear, precise and unequivocal evidence."  *Essex Ins. Co. v. Stage 2, Inc.*, 14 F.3d 1178, 1181 (7th Cir. 1994) (citing Illinois cases).  Having waited until his reply brief to assert that Rypninskyi was prejudiced by the (asserted) lack of a reservation of rights from AIFE, Hope has forfeited the point and thus his estoppel defense.  *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived."); *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

Even setting aside forfeiture, there is no evidence of prejudice sufficient to support an estoppel defense. Hope's reply brief cites ¶¶ 40-49 of his Local Rule 56.1(a)(3) statement in arguing that the evidence "clearly establishes that AIFE monopolized … Rypninskyi's defense and, in reliance thereon, Rypninskyi refrained from seeking other counsel." Doc. 274 at 13. But ¶¶ 40-49 merely describe several meetings that Rypninskyi had with Cassiday Schade's lawyers to discuss his defense. Doc. 252 at ¶¶ 40-49. That evidence does not demonstrate any reliance by Rypninskyi on AIFE's (asserted) failure to reserve its rights, let alone that he was "induce[d] … to surrender h[is] right to control h[is] own defense." *Lay*, 989 N.E.2d at 596; *see also State Farm Fire & Cas. Co. v. Kiszkan*, 805 N.E.2d 292, 298-99 (Ill. App. 2004) (in holding that an insurer that issued a reservation of rights letter one month before trial was not estopped from asserting coverage defenses, reasoning that the insurer followed through with representing the insured at trial and that there was "nothing in the record [to show prejudice] other than the Defendants' assertion that [the insured] was prejudiced by surrendering its defense to [the insurer]").

Equally unavailing is Hope's and Rypninskyi's contention that AIFE waived its non-cooperation defense by waiting too long to send a reservation of rights letter. Doc. 269 at 8-10; Doc. 274 at 13; Doc. 276 at 5-6. Under Illinois law, waiver is an affirmative defense requiring "evidence to support the intentional relinquishment of a known right, either expressly or impliedly, by [the insurer] of its ultimate policy defense." *Kiszkan*, 805 N.E.2d at 299 (internal quotation marks omitted); *see also Stage 2, Inc.*, 14 F.3d at 1181. "An implied waiver arises when [the insurer's] conduct … is inconsistent with any intention other than to waive[.]" *State Farm Mut. Auto. Ins. Co. v. Easterling*, 19 N.E.3d 156, 163 (Ill. App. 2014). The record quite plainly shows that AIFE affirmatively demonstrated an intent *not* to waive its non-

cooperation defense by sending the reservation of rights letter in the immediate wake of Rypninskyi's failure to appear at trial. Doc. 252-6 at 11-12 ("Your failure to cooperate in the defense of the Hope Lawsuit is a breach of the [cooperation clause]. As a result, it appears that no coverage may be available under the Policy. … AIFE maintains a full reservation of all rights, remedies and defenses under the Policy, including, but not limited to, the right to withdraw from its defense of the Hope Lawsuit and disclaim coverage for any indemnity sought under the Policy in connection with this matter."). This case is therefore unlike *Johnson v. Wade*, 365 N.E.2d 11, 14 (Ill. App. 1977), which held that the insurer implicitly waived a non-cooperation defense because, "even after counsel discovered that [the] assured would not attend trial, no attempt was made to inform her of the consequences of her action."

In sum, AIFE is not precluded, by estoppel or waiver, from asserting its non-cooperation defense to support its coverage claim.

## II.     The Cooperation Clause

On the merits, the parties dispute whether Rypninskyi violated the policy's cooperation clause, and thus whether AIFE was relieved of its duty to defend and indemnify him in the underlying suit. Doc. 245 at 7-13; Doc. 251 at 11-15; Doc. 254 at 3-7.

"In order to establish [a] breach of a cooperation clause, the insurer must show [1] that it exercised a reasonable degree of diligence in seeking the insured's participation and [2] that the insured's absence [at trial] was due to a refusal to cooperate." *United Auto. Ins. Co. v. Buckley*, 962 N.E.2d 548, 556 (Ill. App. 2011) (quoting *Founders Ins. Co. v. Shaikh*, 937 N.E.2d 1186, 1193 (Ill. App. 2010)). The "refusal to cooperate" by the insured must be "willful." *Ibid.* Under the governing standard, then, an insurer cannot successfully invoke a cooperation clause "if it was not sufficiently diligent in attempting to secure the insured's appearance *or* if the insured's failure to attend was not due to a [willful] refusal to cooperate." *Wallace v. Woolfolk*, 728

24

N.E.2d 816, 818 (Ill. App. 2000) (emphasis added). Moreover, an insurer must prove "substantial prejudice" stemming from the insured's refusal to cooperate. *Buckley*, 962 N.E.2d at 557. "To prove substantial prejudice, the insurer has the burden to demonstrate that it was actually hampered in its defense by the violation of the cooperation clause." *Ibid.* (internal quotation marks omitted).

The summary judgment record indisputably shows that Rypninskyi's failure to attend trial substantially prejudiced his defense. Doc. 245 at 13-16; Doc. 272 at 15-17. Because Rypninskyi did not appear, the state court struck his contributory negligence defense, gave the jury an adverse inference instruction, and barred his liability expert from offering opinions based on his deposition testimony or the statements he made in the police report. Doc. 268 at ¶ 41; Doc. 271 at ¶ 41. Those sanctions, coupled with the court's ruling excluding Rypninskyi's deposition testimony, made it nearly impossible for the defense (carried on in his absence by Cassiday Schade) to contest liability or damages. In essence, the jury heard only Hope's side of the story, and never heard Rypninskyi's testimony that Hope rear-ended him, that the damage to his truck was "barely noticeable" and "just scratches," and that Hope told him after the accident that "everything is all right." Doc. 268 at ¶ 44; Doc. 271 at ¶ 44. Substantial prejudice is plain under these circumstances. *See Shaikh*, 937 N.E.2d at 1196 (holding that the insurer's "defense of the [underlying] action was plainly and substantially prejudiced by the absence" of the insured, who was "the only known witness to the collision besides [the plaintiff]," and whose testimony would have been "essential" to rebut the plaintiff's testimony as to "the speed of the two vehicles, the force of impact, and the [plaintiff's] appearance and any complaints of injury after the collision").

AIFE is not entitled to summary judgment, however, because genuine fact disputes preclude holding as a matter of law that it used reasonable diligence to advise Rypninskyi of the trial date and that his failure to attend trial was willful. Did Panatera tell Rypninskyi on the day of his depositions that he had an obligation to attend trial? Did Rypninskyi receive the July 7 text message advising him of the trial date and stating that he "will have [to] be there"? Did Panatera and his colleagues attempt to call Rypninskyi "more than ten times" in the months preceding trial? As shown above, the record does not conclusively answer those factual questions in either side's favor. *See Buckley*, 962 N.E.2d at 556-57 (noting that whether the insurer used reasonable diligence and whether the insured's refusal to cooperate was willful are "determinations [that] are made by examining the particular facts of the case at hand"); *see also Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 n.5 (7th Cir. 2015) ("[E]ven when both parties have moved for summary judgment, each contending that the relevant facts are undisputed and the case may be resolved without a trial, the proper outcome may be to deny both motions, on the ground that the material facts are, in fact, disputed.").

Granted, as to diligence, AIFE's investigators attempted to reach Rypninskyi, but their earliest efforts were taken only days before trial, which is likely why AIFE does not argue that those efforts, standing alone, suffice to establish diligence. AIFE does contend that Rypninskyi's receipt of the July 7 text is "sufficient[,] without more[,]" to show that he breached the cooperation clause. Doc. 245 at 9-11; Doc. 272 at 4-5. But the record does not establish that Rypninskyi received the text. Contrary to AIFE's submission, Doc. 272 at 5, Rypninskyi does not merely aver that he did not "recall" whether he received that text; rather, he also avers that a "diligent search of his mobile phone did not reveal the[] message[]." Doc. 249-5 at ¶ 1.

Construing the facts in the light most favorable to Rypninskyi and Hope, that is sufficient to create a genuine dispute on that factual issue.

Even if the record indisputably showed that Rypninskyi received the text, AIFE does not cite—and the court cannot find—any case holding that it is reasonably diligent for an insurer to send a single text message advising its insured that he must attend trial. To the contrary, it would appear from the cases that delivering a single communication is insufficient to show reasonable diligence. *See Johnson*, 365 N.E.2d at 14 (holding that the insurer's "form letter … informing assured of her trial date one month later was an insufficient effort on its part to secure her presence there"); *Ray v. Johnson*, 225 N.E.2d 158, 159-61 (Ill. App. 1967) (in holding that the insured did not refuse to cooperate, reasoning that a letter to the insured, to which the insured did not respond, was the only notice provided of the trial date).

In sum, no party is entitled to summary judgment on AIFE's declaratory judgment claim because genuine factual disputes preclude the court from resolving whether Rypninskyi breached the cooperation clause under the standard imposed by Illinois law.

## Conclusion

The parties' cross-motions for summary judgment on AIFE's declaratory judgment claim are denied. The declaratory judgment claim must be tried.

July 23, 2021

_____
United States District Judge

27